IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

ISAAC LEGARETTA, ANTHONY )
ZOCCOLI and JOHN or JANE DOES 1-20, )
                                            )
Plaintiffs, )
                                            )
vs.                                       ) Case No**.: 2:21-cv-00179 MV-GBW**
                                            )
                                            )
FERNANDO MACIAS, Dona Ana County )
Manager, DIRECTOR BRYAN BAKER, an )
Official with the Dona Ana County Detention )
Center, CAPTAIN BEN MENDOZA, an official )
with the Dona Ana County Detention Center, )
CAPTAIN JOSHUA FLEMING, an official with )
the Dona Ana County Detention Center, COUNTY )
OF DONA ANA and JOHN or JANE DOES 1-20, )
                                            )
                                            )
Defendants. )

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

      Plaintiffs, by and through their attorneys of record, hereby submit their Response to

Defendants' Motion to Dismiss under Rule 12(B) Fed. Rules Civ. Proc. For the foregoing

reasons, Defendants' Motion should be denied.

    1.   **STANDARD FOR RULE 12(b) MOTIONS**

      A Rule 12(b)(6) motion can challenge all claims alleged in the pleading, but it need not

do so. A partial motion under 12(b)(6) can challenge fewer than all of the claims alleged. See, for

example, *Barbagallo v. Marcum LLP,* 820 F. Supp. 2d 429, 443 (E.D.N.Y. 2011); *Ideal

Instruments, Inc. v. Rivard Instruments, Inc.,* 434 F. Supp. 2d 598, 637 (N.D. Iowa 2006). But the

challenge must dispose of an entire claim. A 12(b)(6) motion cannot be used to dismiss specific

allegations that do not result in the dismissal of an entire claim. *BBL, Inc. v. City of Angola,* 809

F.3d 317, 325 (7th Cir. 2015); see *McDaniel v. Vilsack,* 947 F. Supp. 2d 24, 26 n.1 (D.D.C. 2013)

("12(b)(6) is not an appropriate device to use to eliminate a portion of a claim"); *Thompson v. Paul*, 657 F. Supp. 2d 1113, 1129 (D. Ariz. 2009).

A 12(b) Motion is not appropriate to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein* 825 F.3d 206, 214 (4th Cir. 2016). Rather, it is to test the sufficiency of the plaintiffs claim for relief without resolving the substantive merits. *Halebian v. Berv,* 644 F.3d 122 130 (2d Cir. 2011). The primary purpose of such a Motion is to weed out unmeritorious claims, not to argue the facts. The facts as pled, are taken as true for the purposes of a Motion to Dismiss.

A motion to dismiss under Rule 12(b)(1) is based on lack of subject matter jurisdiction. Defendants indirectly alluded to 12(b)(1) in Section IV. of their brief. Defendants basically admit their challenge to the Complaint is a facial attack, not a factual attack when arguing the 12(b)(6) grounds for dismissal. Despite the inclusion of pages of factual and legal arguments that are more appropriately suited for trial, there is no question that this Court has subject matter jurisdiction.

## 2. **VIOLATIONS OF CONSTITUTIONAL RIGHTS**

Plaintiffs are not arguing that expectation of employment is a fundamental right. What they contend is that what is *fundamental* is the right to be free from governmental bodily intrusions, particularly where those intrusions carry a potential for serious harm. In *Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 303 (1990) the Court stated: "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. (citations omitted) And this is especially so when the foreign substance can have serious, even fatal, side effects despite some therapeutic benefits." *See also, Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L.Ed.2d 147 (1973).

In *Washington v. Glucks*berg, 521 U.S. 702, 720 (1997), the Court included the right to bodily integrity in a list of rights it declared were fundamental and protected by the Due Process clause.

> The (Due Process) Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests. Reno v. Flores, 507 U.S. 292, 301-302 (1993); Casey, 505 U.S., at 851. In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights to marry, Loving v. Virginia, 388 U.S. 1 (1967); to have children, Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535 (1942); to direct the education and upbringing of one's children, Meyer v. Nebraska, 262 U.S. 390 (1923); Pierce v. Society of Sisters, 268 U.S. 510 (1925); to marital privacy, Griswold v. Connecticut, 381 U.S. 479 (1965); to use contraception, ibid.; Eisenstadt v. Baird, 405 U.S. 438 (1972); **to bodily integrity**, Rochin v. California, 342 U.S. 165 (1952), and to abortion, Casey, supra. We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment. Cruzan". 497 U.S., at 278-279.(emphasis added).

> Id.

> Recognizing substantive due process as the matrix for constitutional protection against bodily intrusions points to a unified framework for analyzing such claims. This country's history and legal traditions demonstrate that the right against government-compelled bodily intrusions is fundamental. This fundamental right logically encompasses all bodily intrusions, not merely some subset such as medical treatment or non-search-related intrusions. Accordingly, any governmental action that significantly interferes with this right must be subjected to strict scrutiny." (citing by footnote, *Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 303 (1990))

*The Constitutionality of Government-Imposed Bodily Intrusions*, Professor Caitlin Borgmann, CUNY School of Law 2014, https://academicworks.cuny.edu/cgi/viewcontent.cgi?article=1116&context=cl_pubs

It cannot be disputed that the case at bar presents a bodily integrity/intrusion case implicating fundamental rights. Defendants rely on some recent 10th circuit cases which make some recondite distinctions pertaining to different tests for fundamental and non-fundamental

rights cases and whether executive or legislative actions were involved. Defendants have themselves quoted from the case of *Seegmiller v. LaVerkin City*, 528 F.3d 762, 768 (10th Cir. 2008) that "there is no hard- and-fast rule requiring lower courts to analyze substantive due process cases under only the fundamental rights or shocks the conscience standards".

These tests and the "shock the conscience test" were articulated in part due to courts' concern that §1983 cases would turn the constitution into a "fount" of tort law. *Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998) (" ...lest the Constitution be demoted to what we have called a font of tort law" . Most §1983 cases are filed by prisoners and persons who have been the victim of police misconduct. The case at bar is very different. Tort law is not its basis. The basis is government invasion of Plaintiffs' zone of privacy and bodily integrity and their right to make medical  decisions for themselves which form  the gravamen of the complaint.

The Defendants assert, without any authority, that the mandate requiring all first responders to be injected with an experimental medical product, is an "executive" action, and therefore, even if a fundamental right is involved, the court should apply the "shocks the conscience" test to determine whether the complaint states a cause of action under 12(b)(6).  It is not clear that the mandate is an executive action, as it is not executing any existing law, but is, in essence, making a law. At the very least, the mandate could be considered "quasi-legislative". The fact that a county manager may be an executive is of no import if he is creating policy that is legislative in effect. The factual determination of whether an action is executive or legislative would have to look at not only the effect of the action, but whether others, like the County Commissioners of Dona Ana, were also involved in the decision.  As we have seen over the last year and a half, many states' executives, including our own governor, have been wielding

legislative powers under the auspices of a public health emergency. Therefore, whether the act is executive or legislative is a fact to be determined from discovery and evidence cannot be assumed merely by the position of the one creating a legal mandate.

Defendants' characterization of the mandate as executive action is so the Court will apply a stricter test to determine whether a substantive due process violation exists. The test is recognized as a high burden that almost always results in finding in favor of the actor. "Not surprisingly, little governmental action is held unconstitutional under th[is] formulation." Martin A. Schwartz, *Section 1983 Litigation* § 3.05[D], at 3-116 (4th ed. 2006)." *Williams v. Berney*, Id, 1221.

> "However, even if this Court were to apply a "shocks the conscience" test, it may not do so in deciding a motion to dismiss. Applying the "shocks the conscience" test "demands an exact analysis of circumstances" (i.e. a factual determination) *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008). In *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998), the Supreme Court stated: "Rules of due process are not, however, subject to mechanical application in unfamiliar territory. Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."

Even if a "shocks the conscience" standard is the correct one, it is a matter of analysis of circumstances and a review of the facts involved. Defendants are arguing the merits of their defenses rather than the deficiencies, if any, of the Amended Complaint. This Court cannot possibly decide whether the Defendants actions "shock the conscience" or, for that matter, under a strict scrutiny analysis, whether the actions were narrowly tailored and necessary to serve a compelling government interest, without understanding the complex biological risks these vaccines present to the human body and how effective they actually are. The Court may not simply assume that because the vaccine is being widely distributed and taken by many it is "safe

and effective."[1]  The Complaint alleges otherwise and the Court must accept that is true for the purposes of a 12(b) motion. The Court may take judicial notice of the fact that big tech web platforms and mainstream media are banning, censoring and cancelling anyone who suggests that these vaccines have toxic propensities or are harming people.

Thus, the Court may not be aware that scientists and healthcare professionals all over the world are sounding the alarm and frantically appealing to the FDA to halt the vaccines. Fifty-seven top scientists and doctors from Central and South America are calling for an immediate end to all vaccine COVID-19 programs. Other physician-scientist groups have made similar calls, among them: Canadian Physicians, Israeli People's Committee, Frontline COVID- 19 Critical Care Alliance, World Doctors Alliance, Doctors 4 Covid Ethics, and America's Frontline Doctors. These are healthcare professionals in the field who are seeing the catastrophic and deadly results of the rushed vaccines, as well as reputed professors of science and medicine, including the physician with the greatest number of COVID-19 scientific citations worldwide. In addition, the effectiveness of the vaccines is greatly disputed and the Court must accept as true the Plaintiffs' allegations to that effect.

This Court should not apply the dicta Defendants cite from *ETP Rio Rancho Park, LLC v. Grisham*, 2021 WL 431215 (D.N.M. Feb. 8, 2021) to the case at bar. To say that an act which *ostensibly* is for the purpose of saving lives cannot shock the conscience is clearly overly broad. Many exceptions can be thought of such as if Governor Grisham had mandated that all New Mexicans stay inside their homes 24-7 for six months so as to stop the spread of the virus. The

---

1   The Defendants, improperly arguing the facts throughout their motion, assert in the introduction the vaccines are 95% effective. Not only is this figure false, it is being used to coerce millions into taking a vaccine which has substantial risks. The reputable medical journal Lancet  has just published an article showing the effectiveness of the vaccines as Moderna 1.2% Johnson and Johnson 1.2%; AstraZeneca 1.3%;  Pfizer 0.84%

much maligned decision by the Supreme Court, *Korematsu v. United States*, 323 U.S. 214 (1944) which permitted the locking up Japanese-Americans in concentration camps is another. It should be noted too that Judge Browning's decision in *ETP Rio Rancho Park, LLC* was on a preliminary injunction motion not a merits trial.

The U.S. Supreme Court has said that the State's interest in saving lives does not invalidate a claim that the action is unconstitutional."(O)ur cases since Roe accord with Roe's view that a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims."

### 3. DUTY TO PROTECT INMATES

Defendants argue that they have a duty to protect inmates from harm and that this allows them to violate Plaintiffs' rights or that such violation is not shocking because of that duty. This raises factual matters which do not belong in a 12(b) analysis. But since Defendants have made the argument, by simply presuming that the vaccines prevent transmission, it is necessary to point out that the Complaint has alleged that the testing done on these vaccines did *not* show they prevented transmission from the vaccinated to others. The Plaintiff's Amended Complaint quotes Dr. Fauci and WHO's chief scientist on that point. Since that statement must be true for 12(b) purposes, vaccinating prison guards does not protect inmates and the Defendant's argument fails.

### 4. THE COUNTY MANAGER'S DECISION IS NOT DUE ANY DEFERENCE

Defendants also argue, citing *Food & Drug Admin. v. Am. Coll. of Obstetricians & Gynecologists*, No. 20A34, at *1 (Oct. 8, 2020), that the health decisions of politically accountable government officials must be given precedence over judicial investigation into such matters. The *Food and Drug* case relies on the decision in *Marshall v. United States*, 414 U.S. 417, 418 (1974) for its holding regarding deference to public officials. In that case the "official"

was the United States Congress who would  have the resources, specialized committees, and experts to consult such that their decision effecting health might carry some weight. (The United States Congress is not requiring federal employees be vaccinated.)  What special expertise or knowledge of health issues does County Manager Defendant Macias bring to the job? Does County Manager Defendant Macias have the experience or resources to be making health decisions for county employees?  Is his knowledge superior to a federal judge who will hear expert witnesses from doctors and/or scientists and other evidence on the issues presented by this case?

The public officials, if any, whose expertise as it relates to this case should be considered, are the FDA. That is the public official which the *Food and Drug, supra* case cited by Defendants was actually referring to. The FDA has said that these vaccines have not yet been approved, are being released only on an emergency basis and therefore cannot and must not be mandated!!!  *See* 21USC§360bbb–3a, Amended Complaint. And consider  Chief Medical Officer of the National Center for Immunizations and Respiratory Diseases, Dr. Amanda Cohn who, as quoted in the Amended Complaint, stated:

"I just wanted to add that, just wanted to remind everybody, that under an Emergency Use Authorization, an EUA, vaccines are not allowed to be mandatory. So, early in this vaccination phase, individuals will have to be consented and they individuals and they won't be able to be mandated."[1]

These are the public officials this Court may want to defer to as opposed to County Manager Macias.

5.  **PREEMPTION**

The Defendants claim that a piece of EEOC guidance to employers proves that the "field" of the use of insufficiently tested drugs, unapproved by the FDA has not been preempted by the

federal government. The EEOC is a federal not a state agency and its role is to prevent discrimination against people based on being in a protected class. That someone in that agency decided to weigh in on an issue which is outside its jurisdiction with a statement that has absolutely no weight in a legal context should not be a basis for a preemption decision.

The CDC website cited by Defendants is more like an advertisement for vaccination. It ignores all the serious side effects of the vaccine, does not explain emergency use authorization and, with all its encouraging advice to employers, evidences a mistaken belief that the vaccines are the greatest things in the world, which they are anything but. That the CDC has proclaimed in large letters on one of their webpages that the vaccine is safe and effective when it has not been approved by the FDA is a travesty. At the very least, it is gross misrepresentation. The CDC has been sued in an Alabama district court by numerous plaintiffs, in case no. 2:21-cv-00702-CLM on related claims. The Court may take judicial notice of the fact that a subdivision of the CDC, the National of Institute of Health, owns patents on the MRNA technology being used in the vaccines and has a financial interest in the widespread use of the vaccines. In addition, the CDC has a long history of scandals involving corruption, research fraud and cover-ups. In 2016, twelve senior scientists from the CDC lodged a formal complaint of serious ethics violations including research being influenced by corporate and political interests.[2]

The statement by the CDC which the Defendants quote is that, "The Food and Drug Administration (FDA) does not mandate vaccination. However, whether a state, local government, or employer, for example, may require or mandate COVID-19 vaccination *is a matter of state or other applicable law*." This statement is completely disingenuous and

---

[2] https://thehill.com/blogs/pundits-blog/healthcare/301432-the-cdc-is-being-being-influenced-by-corporate-and-political

misleading, particularly the statement that the FDA does not mandate vaccination.  The FDA never mandates vaccines. What the FDA has done is mandate that the vaccine *shall not be mandated* while it is an experimental unapproved emergency use only product. The FDA has said that any recipients must be apprised on the "(II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and (III) **of the option to accept or refuse administration of the product,** of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." 21 U.S. Code § 360bbb–3

This is what the CDC should be advising employers to make known to employees they are wanting to be vaccinated.  The CDC's self-serving, misleading and disingenuous statement in no way makes it apparent that the federal government has not preempted the field of approving drugs and vaccines. Just imagine that the County of Dona Ana had decided to issue a proclamation that it had approved the vaccines for general use and that no longer need recipients be advised of their right to accept or refuse the product. Would federal preemption not clearly disallow such a thing? The same holds true for the mandate at issue in the case at bar.

6. **JACOBSEN V. MASSACHUSSETTS**

*Jacobsen v. Massachusetts*, 197 U.S. 11 (1905) is a decision that was rendered 116 years ago before certain fundamental constitutional rights took shape in the jurisprudence of the Supreme Court and other federal courts. In 1905, suffrage had not yet occurred, civil rights in relation to law enforcement barely existed, critical cases on fundamental rights such as interstate travel, bodily integrity and those protecting a person's "zone of privacy" did not exist, there was no FDA and the federal government was not involved in healthcare like it is today.

Since 1905 the following has become part of the legal landscape:  much of the responsibility for regulating the safety of the workplace, air, water, food, and drugs has shifted to the federal government; women have the right to vote and to decide whether to have children; patients have the right to refuse medical treatment; everyone has the right to be free from arbitrary or discriminatory detention. Scientific advances have produced an array of health care facilities, drugs, vaccines, and technologies to prevent and treat health problems.  "The states' sovereign power to make laws of all kinds has not changed during the past century. What has changed is the US Supreme Court's recognition of the importance of individual liberty and how it limits that power." Jacobson v Massachusetts: It's Not Your Great-Great-Grandfather's Public Health Law, *American Journal of Public Health* · May 2005; Wendy K. Mariner, JD, LLM, MPH and two other professors at the Health Law, Bioethics and Human Rights, School of Public Health, School of Law, and School of Medicine, Boston University, Boston, Mass.[3]

In the just cited article the authors provide an excellent history of the U.S. Supreme Court's decisions related to personal liberty beginning with *Jacobsen.* They conclude as follows:

> A law that authorizes mandatory vaccination during an epidemic of a lethal disease, with refusal punishable by a monetary penalty, like the one at issue in Jacobson, would undoubtedly be found constitutional under the low constitutional test of "rationality review." **However, the vaccine would have to be approved by the FDA as safe and effective, and the law would have to require exceptions for those who have contraindications to the vaccine……. The legitimacy of compulsory vaccination programs depends on both scientific factors and constitutional limits. Scientific factors include the prevalence, incidence, and severity of the contagious disease; the mode of transmission; the safety and effectiveness of any vaccine in preventing transmission; and the nature of any available treatment."** (emphasis added)

---

[3]https://www.researchgate.net/publication/7938135_Jacobson_v_Massachusetts_It's_Not_Your_Great-Great-Grandfather's_Public_Health_Law

This analysis makes it clear that the consideration of factual matters such as "prevalence, incidence, and severity of the contagious disease, the mode of transmission, the safety and effectiveness of any vaccine." etc. are required to determine the constitutionality of a compulsory vaccine program. This precludes a dismissal under 12(b) or a summary judgment for that matter.

To understand Jacobsen's importance to the case at bar or lack thereof, one must look at both the facts in Jacobsen and the warning issued in the opinion itself which cautioned against reading into it a tacit approval of police powers being used by local governments in the future.

In *Jacobsen* at issue was a local ordinance which required individuals to either take a vaccine, pay a $5 fine ($100.00 today), or establish that they qualified for an exemption. Thus, the allegedly violative ordinance allowed him to avoid the vaccine by paying a small fine. If the Defendants in the case at bar had allowed the Plaintiffs to pay a small fine in lieu of accepting an unapproved vaccine, this case would not be before this Court. The Supreme Court of Massachusetts who heard Jacobsen's case before it went to the U.S. Supreme Court found it unnecessary to worry about any possible harm from vaccination, because no one could actually be forced to be vaccinated stating: "If a person should deem it important that vaccination should not be performed in his case, and the authorities should think otherwise, it is not in their power to vaccinate him by force, and the worst that could happen to him under the statute would be the payment of $5."  Commonwealth v. Pear, 183 Mass. 242, 243 (Mass. 1903). Loss of employment is a much greater penalty than a small fine. It has been the coercive motivating factor for many otherwise unwilling people throughout the United States to submit to the unapproved vaccines at issue.   The U.S. Supreme Court *Jacobsen* opinion concluded by stating: "Before closing this opinion, we deem it appropriate, in order to prevent misapprehension as to our views, to observe -- perhaps to repeat a thought already sufficiently expressed, namely -- that the police power of a

State, whether exercised by the legislature or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression." (*Id*, 197 US at 38)

The Defendants misleadingly cite Supreme Court Justice Gorsuch's concurrence in the recent case which struck down New York state's lockdown measures restricting churches, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 208 L. Ed. 2d 206, 207 (U.S. 2020), as support for *Jacobsen's* continuing validity. In fact, Justice Gorusch questioned its scope and precedential weight. He said: ***"Why have some mistaken this Court's modest decision in Jacobson for a towering authority that overshadows the Constitution during a pandemic?*** In the end, I can only surmise that much of the answer lies in a particular judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable or even admirable in other circumstances, we may not shelter in place when the Constitution is under attack. Things never go well when we do." (emphasis added)

Referring to *South Bay Pentecostal Church* v. *Newsom*, No. 20-55533 (9th Cir. May 22, 2020)590 U. S.___ (2020) which had given much leeway to the lockdown measures instituted by California's governor, Justice Gorusch in his *Roman Catholic Diocese* concurrence went on to say: "(T)hat opinion was mistaken from the start. To justify its result, the concurrence reached back 100 years in the U. S. Reports to grab hold of our decision in *Jacobson* v. *Massachusetts*, 197 U. S. 11 (1905). ***But Jacobson hardly supports cutting the Constitution loose during a pandemic...".*** (emphasis added)

Professor George Annas, William Fairfield Warren Distinguished Professor at Boston University and Director of the Center for Health Law, Ethics & Human Rights at Boston University School of Public Health, is a strong proponent of the view that Jacobson has become

a relic of a bygone era when civil liberties were less valued. He also states that "public health

and civil liberties are rarely in tension because "constitutional rights need not be compromised

for effective public health intervention." George J. Annas, *Blinded by Bioterrorism: Public*

*Health and Liberty in the 21st Century,* 13 HEALTH MATRIX 33, 56 (2003).

> "In defending this view of Jacobson as a relic, Professor Annas and others
> emphasize the vast changes in both medicine and constitutional law since
> 1905. In the words of Professor Annas and co-authors Professors Wendy
> Mariner and Leonard Glantz: "Public health programs that are based on force
> are a relic of the 19th century; 21st-century public health depends on good
> science, good communication, and trust in public health officials to tell the
> truth. In each of these spheres, constitutional rights are the ally rather than
> the enemy of public health. Preserving the public's health in the 21st century
> requires preserving respect for personal liberty." Jacobson v Massachusetts:
> It's Not Your Great-Great-Grandfather's Public Health Law, supra.

Numerous Supreme Court cases decided long after Jacobsen have upheld the right to

refuse medical treatment on constitutional grounds.  *See Mills v. Rogers*, 457 U.S. 291, 102 S.Ct.

2442, 73 L.Ed.2d 16 (1982), *Guardianship of Roe*, 383 Mass. 415, 421 N.E.2 nd 40 (1981),

*Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), *Riggins v.*

*Nevada*, 504 U.S. 127,112 S.Ct.1810, 118 L.Ed.2d 479 (1992); *Sells v. United States*, 539 U.S.

166 (2003).

Even the fact that the covid vaccines are designed to save lives does not make their

being mandated a permissible exertion of a state's police power.  ***"(O)ur cases since Roe***

***accord with Roe's view that a State's interest in the protection of life falls short of***

***justifying any plenary override of individual liberty claims***." (emphasis added)  *Cruzan v.*

*Director, Mo. Dept. of Health*, 497 U.S. 261, 278 (1990) (citing *Riggins v. Nevada*, 504 U.S.

127, 135, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992); *Washington v. Harper*, 494 U.S. 210,

108 L. Ed. 2D 178, 110 S. Ct.1028 (1990); see also, *e. g., Rochin v. California*, 342 U.S.

165, 96 L. Ed. 183, 72 S. Ct. 205 (1952); *Jacobson v. Massachusetts*, 197 U.S. 11, 24- 30,

49 L. Ed. 643, 25 S. Ct. 358 (1905)).

The cases cited by Defendants for *Jacobsen's* applicability to the present case are

different from this case. For example, *Phillips v. City of New York*, 775 F.3d 538, 543 n.5 (2d Cir.

2015), involved children who were being required to be vaccinated in order to attend school. The

*Phillips* court quoted from another case cited by Defendants, *Caviezel v. Great Neck Pub. Sch.*,

500 Fed. Appx. 16, 19 (2d Cir. 2012) as follows:

> Here, New York's mandate requires only that children who are not otherwise exempted be
> vaccinated in order to attend school. Because ***"there is no substantive due process right
> to public education,"*** *Bryant v. N.Y.S. Educ. Dep't,* 692 F.3d 202, 217 (2d Cir.2012),
> plaintiffs' substantive due process claim fails…." (emphasis added) *Phillips,* at p. 543.

Conversely, in the case at bar the Plaintiffs have a property right in continued

employment. *Lovato v. City of Albuquerque,* 106 N.M. 287, 289 (N.M. 1987) (citing *Bishop v.*

*Wood*, 426 U.S. 341, 344, 96 S.Ct. (1976). While Plaintiff Zoccoli was a probationary employee,

he was within weeks of ending his one-year probationary period when he was fired for refusing

vaccination and he had an implied agreement with Defendants and a right under state law, that he

would not be fired in retaliation for asserting constitutional rights.

In addition, neither *Caviezel* nor *Phillips* (or *Jacobsen* for that matter*)* involved an

MRNA "vaccine" which is not a traditional vaccine, which is unapproved by the FDA, which has

not been tested sufficiently to know ultimately whether it is safe and effective and which had

already resulted in many thousands of deaths and over fifty thousand reported serious adverse

events. This Court must look at all the facts to determine whether mandating a vaccine, in the

unique circumstances of this case, is in fact "oppressive", which even under *Jacobsen* would

limit a state's police powers mandate it.

The 10th circuit cases cited by Defendants are inapposite. *Dunn v. White,* 880 F.2d 1188 (10th Cir. 1989) involved an incarcerated person who was objecting to being forced to take a blood test. The potential harm to him was minimal or nonexistent, not on a level with being forced to take a vaccine which changes the cells in your body and which entails real and serious medical risks.

*High Plains Harvest Church v. Polis*, 835 Fed. Appx. 372, 374 (10th Cir. 2020) is an unpublished opinion where the Court decided not to enter a preliminary injunction. Defendants cite it for the proposition that state officials may fight a global pandemic through emergency health orders. The case involved public health orders made by the Colorado Governor who had emergency powers granted to him by the legislature. The County of Dona Ana and the individual defendants are nothing like the executive of a state with emergency powers. They have no emergency powers, little or no resources or medical expertise, nor the legal basis to be making medical policy choices for anyone.     Governor Grisham, though an ardent believer that covid is a dread disease permitting all sorts of constitutional violations, who has locked down New Mexico longer and more strictly than almost all other states, has not seen fit to mandate a vaccine for covid. Dona Ana County should not be doing so, for citizens or employees.

Because of Defendants' great emphasis on the *Jacobsen* case, Plaintiffs felt it necessary to show its weaknesses as far as a basis to dismiss this complaint. However, even if it is considered good law today that does not justify a dismissal on a 12(b) motion. In its own words, Jacobsen said: "The police power of a State, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression." (*Id*, 197 US at 38) At most the case stands for the proposition that a state may mandate a vaccine if it is not arbitrary or oppressive to do so.

Whether it is in the case at bar is not a matter of law and *cannot* be the basis for a 12(b) dismissal.

### 7. <u>DOE V. RUMSFELD, GUERTIN V. MICHIGAN  AND QUALIFIED</u> <u>IMMUNITY</u>

"Government officials performing discretionary functions are entitled to qualified immunity from suit under § 1983 as long as "their conduct [did] not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)

> The assertion of qualified immunity at the motion-to-dismiss stage pulls a court in two,   competing directions. On the one hand, the U.S. Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation. But on    the other, when qualified immunity is asserted at the pleading stage, the precise factual basis for    the plaintiff's claim or claims may be hard to identify. T*he court has thus cautioned that it is generally inappropriate for a district court to grant a Fed. R. Civ. P. 12(b)(6) motion to dismiss on the basis of qualified immunity*. Although entitlement to qualified immunity is a  threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under *Rule 12*." (emphasis added) *Guertin v. State of Michigan,* 912 F.3d 907, *907; 2019 U.S. App. LEXIS 200, **1; 2019.

The case *Doe # 1 v. Rumsfeld*, 297 F. Supp. 2d 119 (2003) is on all fours with the case at bar and settles the matter that Defendants were on notice of the unlawfulness of their acts and have no qualified immunity defense. In the case at bar Plaintiffs *statutory* rights to consent or refuse *unapproved* drugs or vaccines were clearly established by the FDA's Emergency Use Authorization under which the covid vaccines have been distributed. (*See* Amended Complaint, p 4). Their rights were also established in *Doe v. Rumsfeld, supra.*

In that case, members of the active duty and selected National Guardsmen components of the Armed Forces as well as civilian contract employees of the U.S. Department of Defense who

had submitted or had been instructed to submit to anthrax vaccinations filed a motion for a preliminary injunction to enjoin inoculation without consent. The anthrax vaccine like the COVID-19 vaccines, had not yet been approved by the FDA. The Court found a substantial likelihood of success on the merits and granted the injunction. The case has been cited with approval by other courts including *Rempfer v. U.S. Dept. of Air Force Bd.*, 538 F. Supp. 2d 200, 210 (D.D.C. 2008) where it was stated: *"*(I)t was a violation of federal law for military personnel to be subjected to involuntary AVA inoculation because the vaccine was neither the subject of a presidential waiver nor licensed for use against inhalation anthrax."

The *Rumsfeld* plaintiffs cited 10 U.S.C. § 1107 as a statutory basis for their claim. It is remarkably similar to 21 U.S.C. § 360bbb-3c which underpins the complaint in the case at bar. The main part that differs from the statute at issue in the instant action is Section (a)(4)(f) of 10 U.S.C. § 1107 which states, as follows:

> (4) Such other information that, as a condition of authorizing the use of the investigational new drug or drug unapproved for its applied use, the Secretary of Health and Human Services may require to be disclosed…(f) LIMITATION AND WAIVER.-(1) In the case of the administration of an investigational new drug or a drug unapproved for its applied use to a member of the armed forces in connection with the member's participation in a particular military operation, the requirement that the member ***provide prior consent*** to receive the drug in accordance with the prior consent requirement imposed under section 505(i)(4) of the Federal Food, Drug, and Cosmetic Act ( 21 U.S.C. 355(i)(4) ) may be ***waived only by the President***. The President may grant such a waiver only if the President determines, in writing, that obtaining consent is not in the interests of national security. (emphasis added)

In an article composed by attorneys Christine A. Samsel and Peter Goodloe of the Denver law firm Brownstein,Hyatt, Farber and Schreck, entitled "Can Employers Mandate COVID-19 Vaccines? Likely Not (Yet), Given Current FDA Emergency Use Authorization Status" https://www.bhfs.com/insights/alerts-articles/2021/can-employers-mandate-covid-19-vaccines-likely-not-yet-given-current-fda-emergency-use-authorization-status, the authors give an

excellent explanation of the FDA process for approval of a drug or vaccine, the history and

meaning of an FDA. Emergency Use Authorization and the similarities of the federal statute in

*Doe v. Rumsfeld* and the one in the case at bar. The article discusses the EEOC guidelines

concerning mandating the covid shots as follows:

> ***EEOC Guidance regarding COVID-19 Vaccines.*** In December 2020, the EEOC
> issued guidance ("Guidance") in which it implied that employers can mandate
> COVID-19 vaccines. However, unlike influenza and similar vaccines, COVID-19
> vaccines are currently being made available ***not*** through the FDA's formal approval
> process, but rather through a more streamlined "emergency use authorization" (EUA)
> process. In its Guidance, the EEOC carefully sidestepped the issue of whether
> employers may mandate vaccines authorized under an EUA, versus those approved
> pursuant to the FDA's formal approval process. (*See* Guidance, Question K.4,
> including links to the FDA's website regarding EUAs.) The statutory provisions
> governing the FDA's emergency process, however, include language that raises
> concern about the potential legality of employers mandating vaccines authorized
> under an EUA. Specifically, the language appears to provide individuals with a
> federal statutory right to refuse administration of vaccines authorized under an EUA.

The article discusses the FDA's formal approval process and compares that to the
streamlined Emergency Use Authorization Process under which all current COVID shots
are permitted to be used.

> The premise presumably is that, in an emergency situation, the FDA will allow a
> greater degree of risk, in part by not requiring the full range of clinical studies that
> would be necessary for formal approval...

> An EUA, therefore, is very different from a formal approval by the FDA. omitted),
> but its FDA-related provisions provided only a modest variation on the agency's
> formal drug-approval process. Then Section 564 was added to the FDCA by the
> National Defense Authorization Act for Fiscal Year 2004 (cite omitted). …

> ***EUA Requirements.*** From its inception, Section 564 (identical to 21 U.S.C. §
> 360bbb-3) has imposed conditions upon the emergency use of FDA- regulated
> products, including vaccines. Importantly, these have always included the
> requirements that recipients be informed, to the extent practicable, that they have
> "***the option to accept or refuse administration of the [EUA] product [and] of the
> consequences, if any, of refusing administration of the product.***" (Section 564(e)
> (1)(A)(ii)(III).) This is a logical requirement, given the increased level of potential
> risk involved in taking an EUA drug as compared to a          drug approved through
> the formal FDA process.

As evidence of the regulatory scope of Section 564, consider that Congress has created only one exception to the notification and right of refusal requirements, which concerns the armed forces. Specifically, these requirements may be waived for the armed forces if the U.S. president determines, in writing, that complying with such requirements is not in the interests of national security. (*See* 10 U.S.C. § 1107a.) The clear implication is that, in the absence of such a written waiver by the president, each member of the armed forces has the right of refusal and must be informed of such right. No such presidential determination for EUA COVID-19 vaccines has been made, and approximately one-third of the armed forces has declined to accept the vaccine, according to Pentagon officials. Given that Congress has not enacted any other exceptions, it stands to reason that the general rule is that each individual in the United States has these same rights.

***COVID-19 Vaccines under EUAs.*** On Feb. 4, 2020, HHS declared a public health emergency for purposes of Section 564. On March 27, 2020, an HHS declaration became effective for the FDA to issue EUAs for drugs, including vaccines. As of this writing, three COVID-19 vaccines have received EUAs from the FDA, the Pfizer-BioNTech, authorized on Dec. 11, 2020, the Moderna vaccine, authorized on Dec. 18, 2020, and the Janssen (Johnson & Johnson) vaccine, authorized on Feb. 27, 2021.

The letters granting the EUAs state, among other things, that the FDA has concluded that the vaccines "***may be*** effective" (emphasis added). The letters also state that the manufacturers are required to give a "fact sheet" to health care providers who administer the vaccines that instruct them to inform vaccine recipients of the right to refuse the vaccine. Notably, upon termination of the current HHS declaration of a public health emergency under Section 564, the further marketing and administration of an EUA vaccine will become illegal (unless and until the vaccine is formally approved by FDA).

***Preemption and State Laws.*** The FDCA is a federal regulatory statute that preempts conflicting state laws. ***This preemptive force should include the individual's right of refusal under Section 564.*** (emphasis added) Many states are currently considering legislation concerning vaccinations, with some seeking to prohibit mandatory vaccines, and others contemplating imposing vaccine mandates under certain circumstances. It remains to be seen whether laws mandating vaccines will pass, and if so, whether they would survive a legal challenge asserting that the right to refuse the vaccine in the FDCA preempts conflicting state law.

***Employer Vaccine Mandates and EUAs.*** Given these facts, can an employer mandate employees to get vaccinated under threat of termination or other employment action? In other words, is an employer that mandates EUA vaccinations subject to—and in violation of—Section 564(e)(1)(A)(ii)(III) by becoming a "person who carries out any activity for which the [EUA] is issued"? The law regarding EUAs is unclear and as yet untested.

Under FDCA section 510(a) (and *Pom Wonderful, LLC v. Coca-Cola Company*, 573 US 102, 109 (2014)), there is no general private right of action under the FDCA, but the question of whether Congress intended to create such a right under Section 564(e)(1)(A)(ii)(III) apparently has not been addressed. However, such a scenario could give rise to a claim for wrongful termination in violation of public policy under state law, given the clear right of refusal under Section 564. The FDCA does not address this issue, but it would be difficult to argue that the required disclosure of the "consequences" of refusing administration of the vaccine contemplates things like termination of employment (as opposed to       health-related       consequences). Moreover, as noted above, once the current HHS declaration of a public emergency under Section 564 is terminated, an employer mandating that employees receive an EUA vaccine will do so knowing (or presumed to know) that such a mandate is unlawful.

The article goes on to mention the instant case as being the first in the nation, but undoubtedly, not the last. The Plaintiffs were successful in *Doe v. Rumsfeld,* because the Court held that federal law prohibited mandating an unapproved vaccine and there had not been a waiver of the informed consent by the President to be able to coerce a member of the military to take the investigational anthrax injection. This is why the Defendants here were on notice that their actions were unlawful and they do not have qualified immunity. The Court is also requested to take judicial notice of the fact that whether governments at any level, could legally make the vaccines mandatory was being widely discussed by political leaders and the news media leading up to the Defendants' doing so.

However, there is also constitutional caselaw apart from FDA laws which put Defendants on notice they were violating constitutional norms. In *Guertin v. State of Michigan*, supra, one of the infamous Flint leads in the water cases, the court found that the lead-contaminated water supplied to citizens of Flint, Michigan violated their fundamental right to bodily integrity because "'individuals possess a constitutional right to be free from forcible intrusions on their bodies against their will, absent a compelling state interest.'" Id. at 919. In denying claims of qualified immunity, the Court also wrote:

***Bodily integrity*** cases usually arise in the context of government-imposed punishment or physical restraint, but that is far from a categorical rule. Instead, the central tenet of the Supreme Court's vast ***bodily integrity*** jurisprudence is balancing an individual's common law right to informed consent with tenable state interests, regardless of the manner in which the government intrudes upon an individual's body. Thus, to show that the government has violated one's right to ***bodily integrity***, a plaintiff need not establish any constitutional significance to the means by which the harm occurs. That is because individuals possess a constitutional right to be ***free*** from forcible intrusions on their bodies against their will, absent a compelling state interest.

***The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. And this is especially so when the foreign substance can have serious, even fatal, side effects despite some therapeutic benefits.*** *(emphasis added)…*

The notion of ***bodily integrity*** has been embodied in the requirement that informed consent is generally required for medical treatment, generally encompasses the right of a competent individual to refuse medical treatment, and is a right that may be inferred from the U.S. Supreme Court's prior decisions. And, although the Court assumed as much, the logic of these cases embraces a liberty interest in artificially delivered food and water essential to life.

———

Every legal case is different and the qualified immunity principle cannot and does not require the established caselaw which abrogates it be an exact factual match of the case where immunity is being litigated. The *Guertin* case held that a non-consensual placement of a potentially toxic substance into the bodies of the plaintiffs was a constitutional violation. That is close enough to the case at bar.

## 8. INDIVIDUAL DEFENDANTS AND THE COUNTY OF DONA ANA

Plaintiffs have stated a cause of action against the individual Defendants for deprivation of fundamental rights to bodily integrity and his property rights inherent in a public employment. Although not stated in the Complaint they are sued in their *individual* capacity . (See Count VI, §1983 violations by individual defendants).

Defendant Macias mandated the injections, apparently along with Director Baker. (See Exhibit B to Amended Complaint where Defendant Baker is identified as one of the parties along with Macias, as having issued the mandate) Captain Mendoza and Captain Fleming had the enforcement authority of the mandate and did take actions to enforce it. One or both of them made the decision to deprive Plaintiff Legaretta of his Special Operations position and pay as punishment for refusing the shot. One or both of the Captain defendants created and allowed a hostile work environment for Legaretta, constructively terminating his employment. The actions taken by the defendants with termination authority over corrections officers violated the Whistleblower Protection Act. The latter Defendants acted in concert in the execution of the mandate by Macias. The hostile work environment was only one of the many forms of coercion applied to Legaretta for his lawful refusal of an experimental product. Plaintiff Zoccoli was terminated, and he would have been terminated only by someone who was his supervisor, most likely one of the captains. Discovery needs to be done to determine who participated in the decisions to create the hostile work environment, change Legarreta's position to a less desirable one and take away a compensable job duty from Legaretta, and terminate Mr. Zoccoli.    "What the rules of notice pleading call for is a complaint alleging enough facts to raise a reasonable expectation that discovery will reveal evidence that a constitutional violation has in fact occurred" *Matthews v. Bergdorf,* 889 F.3d 1136, 1149 (10th Cir. 2018).

With respect to whether the county of Dona Ana can be sued, it is clear that *departments* of municipalities and counties may not be sued. However, Defendants are not being honest with this Court by citing a statute from New Mexico Tort Claims Act which requires that a suit brought under that statute requires naming the board of county commissioners. (Defendants cited the old statute of §4-46-1, which is now 41-4-1 et seq.). See *Torres v. Shea*, 2020 WL 1676920 at

*4, cited by Defendants on p. 23 Motion. Nowhere in this complaint is there any allegation in support of the Tort Claims Act.

Caselaw is clear that a county or municipality can be sued.

The Court concluded that because municipal *corporations* in 1871 were included within the phrase "bodies politic and corporate," Congress intended that local governments be considered "persons" subject to liability under § 1983. *Id.* at 688, 689 n. 53, 98 S.Ct. at 2034, 2035 n. 53." *Stump v. Gates*, 777 F. Supp. 808, 816 (D. Colo. 1991)

Further, Fed. R.Civ. Pro.17 (b) states: Capacity to Sue or Be Sued. Capacity to sue or be sued is determined as follows: …(2) for a corporation, by the law under which it was organized; and (3) for all other parties, by the law of the state where the court is located, except that: (A) a partnership or other unincorporated association with no such capacity under that state's laws may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws…" Whether Dona Ana County is an incorporated county or not, it appears that under Rule 17, it can be sued in its common name without naming the Board of Commissioners, as required under only one statute (apparently, since the Tort Claims Act statute was the only statutory reference made by Defendants.) Notwithstanding the above, if the Court determines that the correctly named party should be "The Board of Commissioners of Dona Ana County", plaintiffs should be granted leave to substitute the correct party name.

Discovery will reveal evidence of the constitutional violation that occurred and what part each defendant played in the violations. The culling out of defendants is not something that the Court should do in a 12(b) motion.

**WHEREFORE**, Plaintiffs respectfully request that the Court deny the Defendants' Motion to Dismiss.

Respectfully submitted,
___*/s/ N. Ana Garner*____
N. Ana Garner

Attorney for Plaintiffs
1000 Cordova Pl., #644
Santa Fe, NM 87505
GarnerLaw@yahoo.com
(505) 930-5170

and
*/s / Jonathan Diener*
Jonathan Diener, Attorney
Co-counsel for Plaintiffs
P.O. Box 27
Mule Creek, NM 88051
(575) 388-1754
jonmdiener@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 28___, 2021, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

*s/ N. Ana Garner*